IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CAMELIA STEWART, | ) | CASE NO. 1:16CV996 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Camelia Stewart ("Stewart") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 11.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Stewart filed applications for DIB and SSI on August 2, 2012, alleging a disability onset

date of August 20, 2007.  Tr. 257, 229, 235.  She alleged disability based on the following:

partial blindness in right eye, depression, anxiety, diabetic gastroparesis, diabetes, high blood

pressure, high cholesterol and anemia.  Tr. 264.  After denials by the state agency initially (Tr.

120, 139) and on reconsideration (Tr. 168, 169) Stewart requested an administrative hearing.  Tr.

186.  A hearing was held before Administrative Law Judge ("ALJ") Eric Westley on September

24, 2014.  Tr. 72-101.  In his October 24, 2014, decision (Tr. 50-65), the ALJ determined that

there were jobs in the national economy that Stewart could perform, i.e., she was not disabled. Tr. 63.  Stewart requested review of the ALJ's decision by the Appeals Council (Tr. 45) and, on March 11, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Stewart was born in 1982 and was 30 years old on the date her applications were filed. Tr. 256.  She completed eleventh grade.  Tr. 79.  She last worked in 2009 as a cashier/baker.  Tr. 80.  She previously worked as a door to door salesperson, a food server, and packaging baked goods at a grocery.  Tr. 81-82.

### B.  Relevant Medical Evidence

In March 2007, a mental health screening showed that Stewart was assessed with no significant mental health concerns.  Tr. 687.  While incarcerated in 2007, she routinely refused insulin treatment for her diabetes.  Tr. 311-355.

In February 2008, Stewart went to the emergency room for flu-like symptoms.  Tr. 692. She exhibited a normal gait, strength, range of motion, sensation, reflexes and affect and was observed to be appropriate and conversant.  Tr. 693.

On September 22, 2011, Stewart saw Amy Zack, M.D., as a new patient to establish care. Tr. 969.  She reported that she had been diagnosed with type I diabetes mellitus as a 15-year old and had not received medical care in many years.  Tr. 970.  She took insulin twice a day, although she took different amounts and she did not have a glucometer to test her sugar level. Tr. 970.  She thought that it sometimes got low.  Tr. 971.  She reported that she had had numbness, pain and tingling in both of her feet for years.  Tr. 970.  Upon exam, she had

decreased sensation in her feet where her shoes were rubbing but had otherwise unremarkable findings.  Tr. 971.  Dr. Zack diagnosed her with diabetes mellitus, unspecified essential hypertension and diabetic peripheral neuropathy.  Tr. 971-972.  She provided Stewart with a glucometer and taught her how to use it.  Tr. 971.  Blood work showed that her glucose level was very high (321 mg/dL; 68-110mg/dL was the normal range).  Tr. 973.

On October 6, 2011, Stewart saw Dr. Zack for a follow-up visit.  Tr. 965.  She had been taking her medications and her sugars were much better and she was feeling better.  Tr. 965.  Boils she had had under her arms and on her groin had drained and disappeared.  Tr. 965.  She denied numbness and tingling in her hands and feet.  Tr. 965.  Upon examination, she had normal sensation in her feet.  Tr. 965.

On February 15, 2012, Stewart returned to Dr. Zack complaining of headaches, feeling sick, pain in her feet and legs, worsening vision, depression, anhedonia, crying, decreased appetite, poor sleep, and suicidal ideation, including having taken pills in December to hurt herself.  Tr. 956.  She stated that she had not been taking any of her medication the last few months.  Tr. 956.  Upon exam, she was crying and had a flat affect.  Tr. 956.  Her sensation was intact.  Tr. 956.  She was diagnosed with diabetes, hypertension, and depression.  Tr. 957.

Stewart was hospitalized from February 25 through February 29, 2012, with complaints of abdominal pain, vomiting, fever, chills and nausea.  Tr. 711.  Upon examination, she had diffuse tenderness in her abdomen and her other findings were unremarkable.  Tr. 712.  Upon discharge, her abdominal pain had improved and she denied nausea or vomiting.  Tr. 717.  She had received a packed cell transfusion (Tr. 717) and underwent an esophagogastroduodenoscopy ("EGD"), which showed moderate retention of gastric secretions

suggestive of poor gastric emptying due to either diabetes gastroparesis[1] or atony due to analgesics (Tr. 719).  She was prescribed Reglan and Lantus, among other medications, and diagnosed with diabetes mellitus type I, hypokalemia, hypertension, tobacco use disorder, anemia, constipation, gastroparesis, and leukocytosis.  Tr. 717.

On April 11, 2012, Stewart returned to the emergency room for abdominal pain, nausea, and vomiting.  Tr. 727.  She had diffuse abdominal tenderness to palpitation and, upon pelvic exam, bilateral adnexal and cervical motion tenderness.  Tr. 730.  Other exam findings were unremarkable.  Tr. 730.  She was assessed with pelvic inflammatory disease, nausea and vomiting with concern for gastroparesis.  Tr. 730.

On May 2, 2012, Stewart had a gastric emptying study which revealed markedly abnormal delayed gastric emptying.  Tr. 894.

On May 14, 2012, Stewart saw gastroenterologist Annette Kyprianou, M.D., upon Dr. Zack's referral for uncontrolled diabetes and gastroparesis.  Tr. 888.  Stewart reported early satiety and postprandial nausea/vomiting that responded well to Reglan.  Tr. 888.  She reported being concerned about side effects but she had not yet had any.  Tr. 888.  Her diabetes was still not well controlled and she was tolerating Reglan.  Tr. 888.  She reported numbness or tingling in her hands or fingers, tingling in her feet, and anxiety and depression.  Tr. 890.  Upon exam, her extremities and neurological findings were normal.  Tr. 890.  She was diagnosed with diabetic neuropathy and gastroparesis that was responding to Reglan.  Tr. 891.  She was advised to continue her Reglan and to aggressively control her glucose levels and take smaller meals to improve her symptoms.  Tr. 891.

---

[1]  Gastropareses is paralysis of the stomach, usually caused by nerve damage, and results in food emptying out of the stomach much more slowly than normal or not at all.  It can develop as a result of diabetes mellitus. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 765.

On June 21, 2012, Stewart saw Michael Gomez, M.D., for a follow-up visit.  Tr. 921. She was taking her Reglan, which improved her symptoms, but reported that, with her medication, she still had symptoms (throbbing pain every other day, vomiting every 3 weeks). Tr. 921.  Without her Reglan, she had symptoms every day.  Tr. 921.  She also reported continuing depression. Tr. 921.  She was currently taking Zoloft and had overdosed herself on insulin on Mother's Day intending to harm herself.  Tr. 921.  She denied suicidal ideation on the day of her visit but reported feeling down over the past few days.  Tr. 921.  She denied any weakness, gait problems, numbness, or burning pain; she also denied gastrointestinal symptoms. Tr. 922.  Upon exam, she had no tenderness in her abdomen, intact sensation and good pulses in her feet, and appeared healthy and in no distress, although she was tearful and had a depressed mood.  Tr. 923.  Dr. Gomez diagnosed her with vomiting, depressive disorder, and muscle cramp.  Tr. 923-924.  He discussed with her the risks and benefits of taking Reglan, and Stewart stated that she accepted the risks and would like to continue taking Reglan based on the significant improvement of her symptoms that she experienced when taking it.  Tr. 923.

From June 29 through July 2, 2012, Stewart was hospitalized for vomiting, diarrhea and abdominal pain.  Tr. 764.  Her abdominal cramping was moderate to severe and constant.  Tr. 768.  She had several episodes of vomiting and bowel movements and three episodes of diarrhea, the latter of which were not usual occurrences for her during a gastroparesis event.  Tr. 768. Upon exam, she had mild diffuse abdominal tenderness, was alert, awake and appropriate, and had good eye contact and a normal affect.  Tr. 769.  She was admitted with impression of vomiting, diabetic gastroparesis and undifferentiated abdominal pain.  Tr. 770-771.

On July 26, 2012, Stewart underwent a mental health assessment with Benjamin Rubin, LSW.  Tr. 870.  She complained of feeling anxious and depressed.  Tr. 870.  She also reported

trouble sleeping, anhedonia, racing thoughts, mood swings, suicidal ideation, high anxiety, panic attacks, excessive anger, isolation, nightmares, problems concentrating, and auditory hallucinations.  Tr. 871.  Upon exam, she was cooperative but anxious and oriented to time, person and place; had a logical, organized thought process and tight associations; and had good judgment and insight, good recent and remote memory, and sustained concentration and attention span.  Tr. 874.  She also had auditory hallucinations and a dysphoric, irritable, anxious, overwhelmed and angry mood.  Tr. 874.  She denied any physical pain.  Tr. 873.  Rubin's diagnostic impression was mood disorder NOS and he scheduled an appointment for her to see therapist Carol Cardello, a clinical nurse specialist, the next day.  Tr. 875.

Stewart saw Cardello the next day with similar complaints.  Tr. 905.  She also stated that she did not want to "get up, shower, eat, or anything."  Tr. 905.  Her anxiety level was high and she had paranoid thoughts.  Tr. 905.  She reported that she had not been taking her iron pills that were prescribed by her doctor and denied side effects.  Tr. 905.  She reported pain in both feet. Tr. 906.  Upon exam, Cardello found her to be oriented in all spheres with sustained concentration and normal memory recall; her mood was anxious, depressed and "kind of excited," her affect was labile, and her behavior was cooperative and restless.  Tr. 905.  Cardello diagnosed her with mood disorder NOS with psychotic features and assessed a Global Assessment of Functioning ("GAF") score of 51-60.[2]  Tr. 906.

Stewart saw Cardello on August 10, 2012, for medication management.  Tr. 861.  She reported poor sleep and racing thoughts, although she could not specify the content.  Tr. 861. Cardello noted that she was "vague about other symptoms."  Tr. 861.  Upon exam, she appeared

---

[2]  GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id*.

subdued, depressed, and had a flat and blunt affect.  Tr. 861-862.  Her speech was slow but she was cooperative, oriented to all spheres, and had sustained concentration.  Tr. 861-862.  She had no suicidal ideation but reported "[a] little bit of paranoid thinking," i.e., people whispering and looking at her.  Tr. 861-862.  Her insight and judgment were deemed questionable.  Tr. 862.  She reported no pain.  Tr. 862.  She told Cardello that she had to see a state psychologist for her disability application.  Tr. 861.  She reported taking her iron pills, was still fatigued, and stated that she had not been using marijuana due to lack of availability.  Tr. 861.  Cardello's impression was that she was mildly depressed and significantly sleep deprived.  Tr. 862.  She prescribed trazadone for sleep.  Tr. 862.

On August 30, 2012, Stewart saw Kenneth Frisof, M.D..  Tr. 857.  She had come to the visit with her ex-husband, Dr. Frisof's patient, due to her concerns about the management of her gastroparesis.  Tr. 857.  She stated that her ex-husband had performed research on the computer and, based on this information, she questioned the safety of taking Reglan.  Tr. 857.  As a result, she had been taking half the recommended dosage of Reglan and was still concerned about long-term consequences.  Tr. 857.  She reported that, currently, she was vomiting and nauseated "only once or twice a week and mostly in the morning."  Tr. 857.  Dr. Frisof recommended a gastroenterology consult and, in the interim, suggested that Stewart could "pragmatically reduce[] the dose and look at how little it takes for her to successfully avoid vomiting."  Tr. 858.

Stewart was admitted to the emergency room on November 1, 2012, for nausea, vomiting and abdominal pain and a suspected flare up of gastroparesis and constipation.  Tr. 978.  She was discharged improved on November 3, 2012, and was diagnosed with gastroparesis due to diabetes, diabetes mellitus type II, unspecified essential hypertension, abdominal pain and

7

chronic kidney disease stage III.  Tr. 977.  She was advised to stop smoking cigarettes and marijuana and to not let herself become constipated for more than three days.  Tr. 978.

On November 14, 2012, Stewart saw endocrinologist Jorge Calles-Escandon, M.D., at the request of Dr. Zack.  Tr. 1038.  She reported that she had had severe diabetes mellitus type II since she was 15 years old, that the first 10 years she was not "intense" about controlling her diabetes but that the last five years she had been much more careful and had dropped her A1c level from 11-12% down to 7% in June 2012.  Tr. 1038.  She reported only taking Lantus and that her gastroparesis symptoms had not been ameliorated with full doses of Reglan.  Tr. 1038. She also reported severe bouts of constipation, sometimes not having a bowel movement for one week.  Tr. 1038.  She had decreased sensitivity of both feet with some mild paresthesia. Tr. 1039.  She admitted to fatigue, blurred vision, numbness and tingling and denied memory loss, sleep disturbance, anxiety, inattention and feelings of depression.  Tr. 1039, 1041.  Upon exam, she had mild diffuse tenderness in her abdomen and an increased liver and "reduced sensation at both feet, 'sock distribution.'"  Tr. 1041.  Dr. Calles-Escandon's impression was type II diabetes mellitus (fair control), lipid control and renal status to be determined, and blood pressure control (adequate).  Tr. 1043.

On November 15, 2012, Stewart visited the emergency room stating that she had diarrhea and could not make it to the bathroom in time.  Tr. 984.  She was admitted but declined anti-diarrhea medication "at this time, will take it later."  Tr. 984.  She also complained of vomiting and nausea and abdominal pain after vomiting.  Tr. 984-985.  Although her nausea and vomiting were consistent with a gastroparesis episode, she stated that she had never had the diarrhea before.  Tr. 984.  Upon examination, she had diffuse tenderness to palpation in her abdomen and an exam of her extremities showed a normal range of motion, full strength, no edema, intact

8

pulses, and intact sensation.  Tr. 985.  She was oriented in all spheres and had a flat affect.  Tr.

985.  She was discharged on November 18, 2012, with an improved condition.  Tr. 998.

From December 10 through December 12, 2012, Stewart was again hospitalized for

symptoms identical to her last episode of gastroparesis.  Tr. 999, 1003.  At one point she reported

vomiting blood.  Tr. 1003.  She had been unable to take her insulin on December 10.  Tr. 999.

She reported that, although she was supposed to have had an elective EGD and to have seen a

gynecologist for a large fibroid that was found, she had not done either.  Tr. 1003.

Upon exam, she had a normal affect, normal strength and sensation, and was oriented in all

spheres.  Tr. 1003.  She was assessed with gastroparesis.  Tr. 1003.  She had an EGD on

December 12, which revealed unremarkable findings other than a small area of localized gastritis

and a possible tear that had already healed.  Tr. 1025.  She was diagnosed with gastritis, anemia,

hematemesis and nausea with vomiting.  Tr. 1018.

On January 15, 2013, Stewart saw Dr. Frisof.  Tr. 1047.  She complained that her eyes

were "doing poorly" and she stated that she was very upset "about a variety of shooting pains in

the leg."  Tr. 1047.  She had seen a doctor who had given her medication for her leg pain.  Tr.

1047-1048.  She also reported a significant loss of balance.  Tr. 1048.  She was pleased with "a

much improved control of her blood sugar."  Tr. 1048.  Upon exam, her movements in the room,

including walking and getting onto the exam table, were very slow and considered and she had

hypersensitivity to light touch on her right anterior shin.  Tr. 1048.  Dr. Frisof discussed the need

for an assistive device if she does not improve after her upcoming eye surgery.  Tr. 1048.

From April 1 through April 4, 2013, Stewart was hospitalized for nausea and vomiting

and her blood sugars were low.  Tr. 1157.  Examination revealed tenderness in her abdominal

region and she had no neurological deficits.  Tr. 1158.  She tested positive for marijuana and

opiates.  Tr. 1157.  She was diagnosed with nausea and vomiting, gastroparesis, anemia, anal fissure, elevated lipase, leukocytosis, diabetes type I, and chronic kidney disease stage II.  Tr. 1158.

On June 27, 2013, Stewart saw Douglas Van Auken, M.D., as a new patient.  Tr. 1193. She complained of having trouble eating and experiencing intermittent constipation, excessive gas or bloating, abdominal pain and a poor appetite.  Tr. 1192-1193.  She reported that her vision was very poor and that she recently mixed up her insulin and overdosed herself.  Tr. 1192.  Upon exam, she had some hyperpigmented spots on her legs, diminished pulses in her left foot, and diminished sensation in her lower leg.  Tr. 1193.  Dr. Van Auken assessed her with diabetes mellitus type I, retinopathy of both eyes, gastroparesis, diabetic peripheral neuropathy, unspecified essential hypertension, anemia, unspecified constipation, hyperlipidemia, insomnia and depression.  Tr. 1194.

On July 18, 2013, Stewart saw Dr. Van Auken for a follow-up visit.  Tr. 1206.  She complained of feeling very tired and stated that, when she had felt like this in the past, she required blood transfusions.  Tr. 1207.  She also reported considerable pain in her legs and feet. Tr. 1207.  Dr. Van Auken informed Stewart that she had medication for her pain (Cymbalta and gabapentin) and that she should take them as prescribed.  Tr. 1207.  Upon exam, she had no tenderness in her abdomen and had normal pulses and intact sensation in her feet.  Tr. 1208.  Dr. Van Auken noted that she had a very significant anemia history but was doing better than she was six months ago and she had not been transfused then.  Tr. 1209.  Her blood pressure control was "ok" but her glucose control was worse, "but she prefers to keep her Lantus as 28u for now." Tr. 1210.  He increased her gabapentin and remarked, "I want her to DO HER PART BY MAINTAINING BETTER SELF CARE."  Tr. 1210.

On September 12, 2013, Stewart saw Paul Hergenroeder, M.D., in the hematology department for an anemia consultation at the request of Dr. Van Auken.  Tr. 1240.  She reported that she had a transfusion four months prior following a heavy menses and a period of rectal bleeding after a bout of constipation.  Tr. 1240.  She was taking her iron three times a day.  Tr. 1240.  She complained of chronic fatigue, mild lightheadedness, constipation and nausea.  Tr. 1243.  She denied vomiting, diarrhea, abdominal pain, loss of appetite, weakness, memory loss, anxiety and depression.  Tr. 1243.  Upon exam, she had full strength and no sensory deficits, a non-tender abdomen, was pleasant and had an appropriate mood and affect.  Tr. 1243-1244.  Dr. Hergenroeder's impression was history of anemia, normocytic with low-normal ferritin and iron. Tr. 1244.

On September 26, 2013, Stewart returned to Dr. Hergenroeder for a follow-up appointment, lab work and a possible iron infusion.  Tr. 1282.  She continued to feel lightheaded but otherwise felt in her normal state of health.  Tr. 1282.  She reported finishing her menses, which had been heavy.  Tr. 1282.  Upon exam, she was alert and oriented, pleasant with an appropriate mood and affect, had full strength and no sensory deficits, and a non-tender abdomen.  Tr. 1285.  She had an iron infusion.  Tr. 1286.  She saw Dr. Van Auken after her infusion and complained that she was tired of being in pain and hurting, had a new problem with her hands getting bent and stiff and trouble moving them, and neuropathy and stiffness in her feet.  Tr. 1271.  She also complained of nausea, abdominal pain and depression.  Tr. 1271.  Upon exam, she had a non-tender abdomen, normal pulses in her feet, but a loss of sensation in her feet.  Tr. 1271.  She also had a labial cyst.  Tr. 1274.  Dr. Van Auken increased her gabapentin. Tr. 1275.

On December 23, 2013, Stewart saw Dr. Van Auken and complained of pain in her lower and upper extremities. Tr. 1353, 1354. Exam findings were as her previous visit and also showed a loss of sensation in her lower leg. Tr. 1354. She had chronic skin changes in her extremities, lower greater than upper. Tr. 1354. She reported trying to get better control of her blood sugars. Tr. 1353. She had no abdominal pain, nausea, constipation or diarrhea. Tr. 1354.

On January 14, 2014, Stewart went to the emergency room for a two-day history of nausea, vomiting and abdominal pain. Tr. 1335. She reported constantly vomiting food within minutes after eating it. Tr. 1335. She also reported constant fatigue, dyspnea on exertion and constipation. Tr. 1335.

On January 21, 2014, Stewart saw Dr. Van Auken for a follow-up visit. Tr. 1366. She reported getting constipated and nauseous when taking her MS Contin; Dr. Van Auken stopped her MS Contin prescription and prescribed Percocet. Tr. 1366. Upon exam, she was pleasant but appeared tired; had some discomfort in her abdomen (left upper quadrant and left lateral); and decreased sensation bilaterally to her mid-calf, decreased toe movements and tenderness to touch. Tr. 1367.

On January 23, 2014, Stewart saw Dr. Hergenroeder. Tr. 1383. She reported her recent hospital visit for gastroparesis and complained of continuing headaches and fatigue. Tr. 1383. Otherwise she was in her normal state of health. Tr. 1383. She denied nausea, vomiting, constipation, abdominal pain, anxiety, depression, or memory loss. Tr. 1383. Upon exam, she had full strength and no sensory deficits, no tenderness in her abdomen, and was pleasant with an appropriate mood and affect. Tr. 1383. Dr. Hergenroeder noted that she had decreasing iron stores since her iron infusion in September 2013 and recommended another iron infusion for the following week. Tr. 1384.

On March 17, 2014, Stewart saw Dr. Van Auken for a follow-up visit complaining of swelling in her lower legs and feet.  Tr. 1414.  She also complained of nausea, heartburn or reflux, bloating after eating, numbness, pain and tingling in her hands and feet, trouble sleeping, anxiety and depression.  Tr. 1414.  Upon exam, she had puffy feet and hands and tenderness and sensory loss above her ankles bilaterally and wrists bilaterally.  Tr. 1414.

On March 25, 2014, Stewart complained of worsening swelling in her legs and feet over the past week that were painful and difficult to walk on.  Tr. 1426.  She reported the following: being on her feet the "majority of the day" taking care of her ill, elderly grandmother; that she previously had swelling when she visited the hospital for a gastroparesis episode and they treated her, successfully, with Lasix; her primary care physician gave her a prescription for hydrochlorothiazide to relieve her swelling but "he never ordered the prescription"; and she recently (the previous week) started a new estrogen medication.  Tr. 1414.  Upon exam, she was pleasant, appropriate, alert, oriented, had full strength in her lower extremities, a normal gait, full range of motion in all extremities, normal pulses in her lower extremities, and a non-tender abdomen.  Tr. 1429.  She also had 1-2+ pitting edema in her lower extremities from her knees down and "multiple ecchymosis scattered throughout anterior aspect of lower extremities."  Tr. 1429.

On March 30, 2014, Stewart went to the emergency room for vomiting, headaches, myalgias and abdominal pain.  Tr. 1439.  She had no diarrhea and her bowel movements were normal.  Tr. 1439.  Upon exam, she was awake, alert, appropriate and appeared comfortable.  Tr. 1441.  She had good eye contact, normal speech and normal affect.  Tr. 1441.  She did not have abdominal tenderness but had 1-2+ pitting edema bilaterally to her mid shins, which she stated

was better than usual.  Tr. 1441.  She was treated, her vomiting improved, and she was discharged feeling better and declining admittance for hydration.  Tr. 1441-1442.

On April 17, 2014, Stewart saw Dr. Hergenroeder complaining of chronic fatigue.  Tr. 1464.  She reported that she saw her OB/GYN for her menorrhagia (menstrual periods with abnormally heavy or prolonged bleeding) but declined hormonal therapy despite menses that last 12 days.  Tr. 1464.  Upon exam, she had no edema in her extremities, full strength and no sensory deficits.  Tr. 1468.  She was oriented and had a pleasant and appropriate mood and affect.  Tr. 1468.

On April 22, 2014, Stewart saw Dr. Van Auken for a follow-up visit.  Tr. 1484.  She complained of pain and spasms in her fingers, legs and feet that felt like they were twisting.  Tr. 1485.  The pain lasted for hours, not just minutes, and moved from one part of her body to another.  Tr. 1486.  Percocet "kind of" soothed it but it did not go away and would flare up, for example, when she moved her leg.  Tr. 1486.  She also complained of anxiety and depression.  Tr. 1486.  Upon exam, she had no extremity edema, no abdominal tenderness, normal distal pulses and intact sensation in her feet but sensory loss "till the ankles" bilaterally.  Tr. 1486.  Dr. Van Auken increased her Neurontin dosage and, at Stewart's request, agreed to prescribe oxycontin.  Tr. 1488.

On May 3, 2014, Stewart went to the emergency room for cramping pain in her bilateral lower extremities that had lasted for one hour.  Tr. 1521.  Symptoms were worse with movement.  Tr. 1521.  She was diagnosed with muscle cramps.  Tr. 1522.

On June 1, 2014, Stewart saw Dr. Van Auken for a follow-up visit.  Tr. 1550.  She reported numbness, pain and tingling in her hands and feet and anxiety and depression.  Tr. 1550.

She had normal pulses in her feet and sensory loss in her ankles bilaterally.  Tr. 1550.  She was pleasant, interactive, and appeared uncomfortable.  Tr. 1550.

On August 19, 2014, Stewart saw Dr. Van Auken for a follow-up visit.  Tr. 1574. She reported that the pain in her legs and hands was getting worse.  Tr. 1574.  She stated that she had numbness and was having difficulty manipulating things.  Tr. 1574.  She had also had some falls recently and explained that she does not feel her feet on the ground very well.  Tr. 1574.  She had been trying to take care of her 90-year-old grandmother but it required more strength and agility than she had.  Tr. 1574.  Upon exam, she had diminished sensation to her proximal lower leg. Tr. 1575.  She had no abdominal tenderness or edema in her extremities.  Tr. 1575.  She appeared worried and sad about her situation, stating that she had not known how to protect herself from diabetes when she was young and now she had nerve damage.  Tr. 1575.  Dr. Van Auken added a low dose fentanyl patch for pain to her prescriptions, noting that Stewart thought a pain patch was the least likely prescription to be taken from her by her family and friends.  Tr. 1577.  Her blood pressure was elevated and Dr. Van Auken commented that she had not been taking her medications.  Tr. 1577.

On September 16, 2014, Stewart saw Dr. Van Auken for a follow-up visit.  Tr. 1610. Upon exam, she had no evidence of edema and normal sensation in her feet.  Tr. 1611.

### C.  Medical Opinion Evidence

#### 1.  Treating physician

On September 16, 2014, Dr. Van Auken completed a physical medical source statement on behalf of Stewart.  Tr. 1333-1334.  He opined that, in a normal workday, Stewart could not lift or carry any weight safely or stand/walk more than 0.1 hours (and only in familiar settings and at short distances) due to her "profound diabetic neuropathy" in her hands and feet, loss of

balance and frequent tripping, and poor vision.  Tr. 1333.  She could not sit more than three hours total in an eight-hour day because of leg cramps and fatigue.  Tr. 1333.  He also stated that she could never perform any postural activities, reach, push, pull, or perform fine and gross manipulation; could never be around heights, moving machinery, or temperature extremes; would have to change positions at will, elevate her legs 120 degrees at will, and need an additional four breaks during the day; did not have an assistive device but that he would order a red-tipped cane for her; and that her pain was severe and interfered with her concentration, took her off task, and would cause absenteeism.  Tr. 1333-1334.

Dr. Van Auken also completed a mental medical source statement on behalf of Stewart on the same day.  Tr. 1331-1332.  He opined that Stewart had a rare (cannot be performed for any appreciable time) ability to: follow work rules; maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerances; deal with the public; interact with supervisors; function independently without redirection; work in coordination with or proximity to others without being distracted or distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out complex or detailed job instructions; behave in an emotionally stable manner; and manage funds/schedules.  Tr. 1331-1332.  Dr. Van Auken explained that his opinion was based on Stewart's depression and anxiety due to advanced diabetes and neuropathy which contributed to her overall picture of major depression due to illness.  Tr. 1332.

### 2.  Consultative examiner

On August 22, 2012, Stewart saw Deborah Ann Koricke, Ph.D., for a psychological evaluation.  Tr. 847-853.  Stewart reported that, until February 2012, she used marijuana "all day every day," drank excessively and smoked a pack of cigarettes a day; then her doctors told her that she was very ill and would likely die if she did not stop her alcohol and drug use and start taking her medications as prescribed.  Tr. 847-848.  She got scared when she developed gastroparesis earlier in 2012.  Tr. 848.  She reported a good work history, getting along well with people and never having gotten fired.  Tr. 848.  She described her mood as scared, tired, worried, suicidal thoughts, crying, dizziness, no appetite, down and sad.  Tr. 848.  She was depressed every day but she would never act on her suicidal thoughts.  Tr. 848.  She just began seeing mental health providers in June 2012.  Tr. 848.  Her Zoloft was not helping but her trazadone helped her sleep.  Tr. 848.  She did not do household chores because she did not feel like it and her mother would do them.  Tr. 848.  She stated that "literally" she will stay in bed all day and not do anything—not watch television, read, or talk to anybody.  Tr. 849.  Her boyfriend was very fed up with her.  Tr. 849.

Dr. Koricke commented that Stewart spent the evaluation crying and looked down on the floor throughout.  Tr. 849.  She did not have difficulty sitting.  Tr. 849.  She reported feeling depressed since being in prison in 2005 and that, previously, she was able to balance her everyday drug use with her jobs and be successful.  Tr. 849.  Aside from worrying that she is not going to get any better, anxiety was not a prominent feature for her.  Tr. 849.  Upon exam, she was oriented to time, person, place and situation and could understand instructions, but she answered very slowly and it took her a long to do them.  Tr. 849.  She could do serial 3's and remember 6 digits forward and 3 digits backward.  Tr. 849-850.  Dr. Koricke commented that

she displayed poor judgment in the past as far as her drug use, but was displaying somewhat improved judgment in that she has stopped taking drugs and is seeking psychiatric care.  Tr. 850. Dr. Koricke diagnosed her with alcohol abuse and cannabis dependence both in full remission per patient report; major depressive disorder, recurrent, severe without psychotic features; and personality disorder, NOS.  Tr. 850.  She opined that Stewart's prognosis was guarded, given that she had been depressed since getting out of prison and felt like she would never be able to get a good job because of her felony conviction, she was very tired, and her diabetes had appeared to get the better of her, which was also very depressing to her.  Tr. 851.

Dr. Koricke opined that Stewart would be unable to understand and apply instructions as well as would be expected in a competitive workforce and would be expected to have significant difficulties learning new tasks; she was unable to perform most day-to-day tasks correctly; would likely have great difficulty performing appropriately with others because she is so sluggish and slow with her thinking and would be frustrating for coworkers; and would have virtually no ability to respond appropriately to others.  Tr. 852.  Dr. Koricke assigned a GAF score of 48.[3] Tr. 851.

### 3.  State agency reviewers

On October 15, 2012, state agency physician Gary Hinzman, M.D., reviewed Stewart's record.  Tr. 112-114.  Regarding Stewart's residual functional capacity ("RFC"), Dr. Hinzman opined that Stewart can perform light work, can never climb ladders, ropes and scaffolds, can occasionally climb ramps and stairs, kneel, stoop, crouch and crawl, and must avoid all exposure to hazards.  Tr. 112-114.  On April 9, 2013, Leigh Thomas, M.D., reviewed Stewart's record and adopted Dr. Hinzman's findings.  Tr. 152

---

[3]  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *See* DSM-IV-TR, at 34.

On October 10, 2012, Irma Johnston, Psy.D., reviewed Stewart's record.  Tr. 114-116.
Regarding Stewart's mental RFC, Dr. Johnston opined that Stewart could perform one- to four-
step tasks in a setting where close attention to detail was not required and the work was not fast-
paced and had no more than occasional changes and no more than superficial social demands.  Tr.
114-116.  On April 9, 2013, Caroline Lewin, Ph.D., reviewed Stewart's record and adopted Dr.
Johnston's findings.  Tr. 162-164.

### D.  New evidence provided to the Appeals Council

The following evidence was not provided to the ALJ but was submitted to the Appeals
Council.  On October 8, 2014, Stewart went to the emergency room complaining of abdominal
pain.  Tr. 1626.  She stated that it felt like her gastroparesis.  Tr. 1626.  She had not taken any of
her medication the night before because she had not felt well, with episodes of nausea/vomiting.
Tr. 1626, 1630.  Upon exam, her abdomen was diffusely tender, she had no edema in her
extremities, and her speech was normal.  Tr. 1627.  She was admitted, treated with her
medication, and signed herself out against medical advice with a diagnosis of gastroparesis.  Tr.
1627, 1629-1630.  She stated that she was unhappy with her care at the hospital, commenting
that she felt they did not do anything more than what she could have done herself at home.  Tr.
1630.

Stewart was again hospitalized from October 21 through October 24, 2014, complaining
of nausea, abdominal pain more prominent in her epigastrium, fatigue with dyspnea on exertion,
lower extremity edema, and occasional sweating and chills which had all worsened over the past
week.  Tr. 1695.  She was given two units of blood.  Tr. 1695.  She had stopped taking her
prescription iron pills a few weeks prior.  Tr. 1699.  Her abdominal pain resolved after a bowel
movement, her first in seven days.  Tr. 1695, 1698.  Her lower extremity edema improved

following her transfusion and was believed to be cardiogenic due to anemia.  Tr. 1695.  She was scheduled to have "a pill placed endoscopically,"[4] but three hours before the procedure she and her husband refused the procedure; she stated that she wished to have it performed as an outpatient; and she wanted to be discharged home.  Tr. 1695.  The attending provider explained the risk of an incomplete workup and the resultant likelihood that she would be hospitalized again for the same, and, although Stewart stated that she understood, she "refused to be in the hospital any further."  Tr. 1695.  She was discharged with a change in the dosage of her Lantus, urged to "PLEASE make sure to continue checking your blood sugar levels," and an appointment was scheduled with an insulin specialist to keep her sugar levels controlled.  Tr. 1695.  She was noted to be a ½-1 pack a day cigarette smoker and daily marijuana user.  Tr. 1710-1711.

## E. Testimonial Evidence

### 1. Stewart's Testimony

Stewart was represented by counsel and testified at the administrative hearing.  Tr. 74-94. She testified that she left school during 12th grade because she had had a child and it was too difficult to work and go to school.  Tr. 79.  She tried to get a GED but was unable to.  Tr. 79.  At the time of her hearing, she had two children who were sixteen and seven years old and who lived with her.  Tr. 80.

Stewart stated that she can no longer work because she has gastroparesis and she never knows when that problem is going to attack her.  Tr. 83.  She also has frequent stomach problems and "fatigue from my blood.  I'm not able to rejuvenate it fast and then I lose it so I'm always tired."  Tr. 83.  Her legs and feet hurt from her neuropathy and she has difficulty standing

---

[4]  It appears that the reference is to a capsule endoscopy, in which a video camera is enclosed in a pill-sized capsule swallowed by the patient and provides a means by which the digestive tract may be inspected.  *See Dorland's*, at 620.

and being on her feet.  Tr. 83.  She also lost vision and it is hard for her to deal with that.  Tr. 83.

Her blood pressure medication makes her dizzy most of the time.  Tr. 83.  She spends her days

trying to make it through and have a decent day without pain or nausea or tiredness.  Tr. 83.

She described a gastroparesis attack as being an all-day process of vomiting food that she

eats that does not go down into her stomach.  Tr. 83-84.  She has to be hospitalized every time

she gets an attack and given antibiotics and Reglan, which helps to push the food back down.  Tr.

84.  She takes Reglan all the time but when she is hospitalized they administer it intravenously

"to calm it down."  Tr. 84.  "Sometimes it may not work.  That's why it's always a

hospitalization for at least three days or more."  Tr. 84.  The last time she was hospitalized was

six or seven months prior to the hearing.  Tr. 85.  She has gastroparesis attacks every three

months, give or take.  Tr. 85.  When she first developed gastroparesis she was having an attack

around every month but, with medication, it settled "as much as they could, but it's not gone

away."  Tr. 85.  She also has constant nausea but she does not have to be hospitalized for that.

Tr. 86.

Stewart testified that, due to leg pain from neuropathy, she can stand in one place for five

to ten minutes.  Tr. 86.  Then she has to sit down but, if she gets leg cramps while sitting, she

has to sit for at least an hour before her cramps settle enough to allow her to move to get back up.

Tr. 86.  If her legs do not cramp, she has to sit for less time.  Tr. 86.  She gets leg cramps every

so often during one hour and some last long and some are sharp and then stop.  Tr. 87.  She can

do nothing to relieve the cramps; she can try to shake it off but otherwise she just has to bear it

until it is gone, and they come and go all day.  Tr. 87.  She can walk maybe up to fifteen minutes

at a time, depending on whether she is walking on an incline; it is better if she walks where it is

flat.  Tr. 86.  She cannot lift anything because of her fatigue from her blood loss.  Tr. 88.  She

also has neuropathy in her hands, so if she is holding a cup her fingers will cramp and "stick that way for 15/20 minutes until they uncramp." Tr. 88. If she doesn't use her hands they don't cramp. Tr. 89. She does not sleep well because she wakes up from cramps in her legs and feet. Tr. 92. She takes medication to help her sleep but most of the time it does not help. Tr. 92. The next day she is fatigued as if she had never slept. Tr. 93. She dreads the next day coming because she has to do the same thing all over again and she does not want to go through it. Tr. 93.

At the time of the hearing, Stewart was seeing Dr. Van Auken every month for mental health treatment. Tr. 89. She does not go to counseling. Tr. 89. She takes Cymbalta and Abilify but they do not help her. Tr. 89-90. She is not sure if she has side effects of these medications or if it is just her. Tr. 90. She has depression, anxiety, and sometimes she hears a little voice or so. Tr. 93. She hears the voices "maybe every now and then," about a couple of times a month. Tr. 93. Her attorney commented that she was emotional on the day of the hearing and she stated, "I'm like this every day. This is what I'm like." Tr. 93. She does not do anything that she used to do seven or eight years before, such as work, walk, drive and associate. Tr. 93. She last drove in 2010. Tr. 93. She could not renew her license because she lost her eyesight; she has no peripheral vision in her left eye. Tr. 91, 94. Her right eye is not as bad. Tr. 91. She is afraid to be around people because she cannot see them. Tr. 90. She would still be afraid to be around familiar people that she would see every day. Tr. 90. She would not have problems taking instructions from a supervisor: "Oh, I'll listen. I mean do the best I can." Tr. 90.

Her blood sugar levels have come down quite a bit from where they were before. Tr. 91. She explained that, normally, a range lower than seven is preferred; when she had all her

complications her level was about 13 and, at the time of the hearing, she believed it was around

9.  Tr. 91.  She checks her blood sugars twice a day and is taking her medication as prescribed.

Tr. 91.  She still smokes marijuana but had not done so for about three to four weeks prior to the

hearing.  Tr. 94.

### 2.  Vocational Expert's Testimony

Vocational Expert Paula Zinsmeister ("VE") testified at the hearing.  Tr. 94-99.  The

ALJ discussed with the VE Stewart's past relevant work as a bakery worker.  Tr. 95.  The ALJ

asked the VE to determine whether a hypothetical individual of Stewart's work experience could

perform her past work if the individual had the following characteristics: can never climb

ladders, ropes or scaffolds; must avoid all exposure to hazards such as unprotected heights,

moving machinery and commercial driving; can perform simple tasks in a setting where no close

attention to detail is required and there are only occasional changes; can perform goal-oriented

work but not at a production rate pace; and can interact with supervisors, co-workers and the

public if that interaction is limited to speaking and signaling.  Tr. 95-96.  The VE answered that

such an individual could perform Stewart's prior job of bakery worker.  Tr. 96.  The ALJ asked

if the individual described could perform any other jobs and the VE stated that such an individual

could perform the following jobs: store laborer (21,000 national jobs, 1,000 Ohio jobs); hospital

cleaner (780,000 national jobs, 26,000 Ohio jobs); and dining room attendant (55,000 national

jobs, 2,000 Ohio jobs).  Tr. 96-97.

Next, the ALJ asked if such an individual could still perform Stewart's past work if the

individual was limited to sedentary work.  Tr. 97.  The VE answered that such an individual

could not.  Tr. 97.  The ALJ asked if such an individual could perform any other work and the

VE replied that such an individual could perform work as a document preparer (45,000 national

jobs, 1,600 Ohio jobs); order clerk  (40,000 national jobs, 1,500 Ohio jobs); and charge account clerk (40,000 national jobs, 1,600 Ohio jobs).  Tr. 97-98.  The ALJ asked the VE if an individual could perform Stewart's past work or any other work if that individual would be off-task for 20% of the time and the VE answered no.  Tr. 98.

Stewart's attorney asked the VE whether her answer would change if the ALJ's second hypothetical individual, limited to sedentary work, had the following, additional limitation: can occasionally finger and occasionally use fine and gross manipulation, bilaterally.  Tr. 98-99.  The VE answered that her answer would change and that there would be no jobs available.  Tr. 99.  Stewart's attorney asked the VE if the individual could perform any work if that individual would miss two or more days a month on a regular and ongoing basis and the VE stated that missing two days per month would preclude employment.  Tr. 99.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his October 24, 2014, decision, the ALJ made the following findings:

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1.      The claimant meets the insured status requirements of the Social Security
        Act through June 30, 2013.  Tr. 52.

2.      The claimant has not engaged in substantial gainful activity since August
        20, 2007, the alleged onset date.  Tr. 52.

3.      The claimant has had the following severe impairments: diabetes, loss of
        visual acuity, affective disorders and personality disorder.  Tr. 52.

4.      The claimant does not have an impairment or combination of
        impairments that meets or medically equals the severity of one of the
        listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 53.

5.      The claimant has the residual functional capacity to perform sedentary
        work as defined in 20 CFR 404.1567(a) and 416.967(a) except the
        claimant can never climb ladders, ropes or scaffolds and must avoid all
        exposure to hazards such as unprotected heights, moving machinery, and
        commercial driving.  Mentally, the claimant can perform simple tasks in
        a setting where no close attention to detail is required and there is only
        occasional changes.  The claimant can perform goal-oriented work but
        cannot work at a production rate pace and can interact with supervisors,
        coworkers, and the public if that interaction is limited to speaking and
        signaling.  Tr. 55.

6.      The claimant is unable to perform any past relevant work.  Tr. 63.

7.      The claimant was born on April 19, 1982 and was 25 years old, which is
        defined as a younger individual age 18-44 on the alleged disability onset
        date.  Tr. 63.

8.      The claimant has a limited education and is able to communicate in
        English.  Tr. 63.

9.      Transferability of job skills is not an issue in this case because the
        claimant's past relevant work is unskilled.  Tr. 63.

10.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the
        national economy that the claimant can perform.  Tr. 63.

11.     The claimant has not been under a disability, as defined in the Social
        Security Act, from August 20, 2007, through the date of this decision.
        Tr. 65.

## V. Parties' Arguments

Stewart objects to the ALJ's decision on three grounds.  She argues that ALJ failed to give appropriate weight to the opinions of her treating physician and her consultative examiner; failed to properly consider her symptoms, and that she is entitled to a remand for consideration of new and material evidence.  Doc. 17, pp. 14-23.  In response, the Commissioner submits that the ALJ properly considered the opinion evidence and Stewart's symptoms and that she is not entitled to a remand for the consideration of additional evidence.  Doc. 20, pp. 7-21.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when he considered the opinions of Drs. Van Auken and Koricke

Stewart argues that the ALJ erred because he did not give appropriate weight to the opinions of Dr. Van Auken, her treating source, and Dr. Koricke, the consultative examiner. Doc. 17, p. 14-19.

### 1. Treating source Dr. Van Auken's opinions

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

### a. Dr. Van Auken's physical assessment

To recap: Dr. Van Auken opined that, in a regular workday, Stewart could not lift or carry any weight safely and could stand/walk no more than 0.1 hours (and only in familiar settings and at short distances) due to her "profound diabetic neuropathy" in her hands and feet, loss of balance, frequent tripping, and poor vision. Tr. 1333. She could not sit more than three hours because of leg cramps and fatigue and could never perform any postural activities or reach, push, pull, or perform fine and gross manipulation. Tr. 1333-1334. She would have to change positions at will, elevate her legs 120 degrees at will, needed an additional four breaks during the day, and would be absent due to her severe pain. Tr. 1334. The ALJ gave "no" weight to Dr. Van Auken's opinion, explaining,

> [H]is overall opinion is overstated and unsupported by the normal physical findings discussed above including normal strength and sensation. Additionally, in his opin[ion]

Dr. Van Auken opined the claimant would need to elevate her legs at will.  However, although the medical records in this case are extensive, there is no other evidence instructing the claimant to elevate her legs, nor is there any evidence of extremity edema. Finally, Dr. Van Auken opined the claimant would need multiple breaks and fatigue and chronic illness would interfere with her ability to work eight hours a day, five days per week.  In this case, as mentioned above, the medical evidence of record does not support the need for additional breaks and so on.  Instead, the claimant was consistently described as alert and oriented to all spheres with normal strength.  Additionally, the record contains only intermittent findings of decreased sensation in the claimant's feet, which the undersigned has considered.  Thus, any limitations associated with the claimant's impairments would not preclude her from performing work at the sedentary exertional level to the extent described in this decision.

Tr. 62.

Stewart argues that the ALJ's reasons for not giving deference to Dr. Van Auken's opinion are "refuted by the medical records supporting the limitations determined by Dr. Van Auken."  Doc. 17, p. 16.  Specifically, she identifies medical records that show she had complained of pain, numbness and tingling in her extremities and that she had diminished sensation and pulses in her feet.  *Id.*  She also submits that the record includes evidence of her peripheral neuropathy diagnosis and her complaints of fatigue, cramps, balance "issues," and the "discussion of the necessity of an assistive device."  *Id.*  However, the fact that there may be substantial evidence in the record that may support Dr. Van Auken's opinion does not change the fact that, as the ALJ found, there was substantial evidence in the record undercutting Dr. Van Auken's opinion, including Dr. Van Auken's own examination findings on the day he rendered his opinion.  *See* 20 C.F.R. § 404.1527(c) (an ALJ considers the supportability and consistency of the opinion when explaining the weight given to medical opinion evidence).  The ALJ considered Stewart's complaints of numbness and tingling in her extremities (Tr. 59) and pain (Tr. 56, 57, 58, 59) and acknowledged exam findings showing diminished sensation and pulses in her feet (Tr. 56, 58, 59, 62), a diagnosis of diabetic neuropathy (Tr. 56, 58), and complaints of fatigue (Tr. 53, 56) and cramps (Tr. 56).  He found that, despite this evidence, there were

consistently normal examination findings throughout the record and, in some cases, no evidence in the record at all to serve as the basis for Dr. Van Auken's opinion that Stewart's capacity to perform work was so severely limited. In other words, the ALJ considered all the evidence and sufficiently explained his treatment of Dr. Van Auken's opinion. This was not error. *See Wilson*, 378 F.3d at 544 (if a treating source opinion is deemed inconsistent with the other substantial evidence in the case record, it is not entitled to controlling weight); 20 C.F.R. § 404.1527(c). Finally, the evidence that Stewart identifies as supporting Dr. Van Auken's opinion is not persuasive; for example, the fact that a treatment note revealed that a provider had a "discussion" with Stewart regarding the need for an assistive device, as Stewart asserts, does not change the fact that Stewart neither used an assistive device nor had been prescribed one.

Stewart criticizes the ALJ for not addressing all the factors in 20 C.F.R. § 404.1527(c), notably the length and nature of her treating relationship with Dr. Van Auken. Doc. 17, p. 17. But an ALJ is not required to discuss every factor in 20 C.F.R. § 416.927(c). *Francis v. Comm'r of Soc. Sec*., 414 Fed. App'x 802, 804 (6th Cir. March 16, 2011) ("Although the regulations instruct an ALJ to consider [the length, nature, and extent of the treatment relationship], they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis."). And, although the ALJ did not comment directly on Stewart's relationship with Dr. Van Auken, he detailed her visits to him elsewhere in his decision, indicating that he was aware of the length and nature of her relationship with Dr. Van Auken. *See* Tr. 58-59 (The ALJ referring to Stewart's first visit to Dr. Van Auken on June 27, 2013; her September 16, 2014, visit almost 15 months later when Dr. Van Auken completed the medical source statements on her behalf; and interim visits on July 18 and September 28, 2013, and April 22 and September 7, 2014); *see also*

Tr. 1332 (Dr. Van Auken's opinion in which he stated that he had treated Stewart for 16 months).

### b. Dr. Van Auken's mental assessment

Stewart also argues that the ALJ erred when he gave "no" weight to Dr. Van Auken's opinion with respect to her mental limitations.  Doc. 17, pp. 16-17.  Again, Stewart only details evidence in the record that she believes supports Dr. Van Auken's opinion; she does not describe an error by the ALJ.  The ALJ explained that Dr. Van Auken's opinion that Stewart could rarely make occupational adjustments; understand, remember and carry out job instructions; and behave in an emotionally stable manner due to anxiety and depression was inconsistent with Dr. Van Auken's normal examinations findings on the day he rendered his opinion as well as other treatment notes in the record detailing normal mental examination findings.  Tr. 61.  Moreover, the ALJ acknowledged items in the record referencing Stewart's depression, suicidal ideation (including taking an overdose of insulin), racing thoughts, anxiety, paranoia (Tr. 60, 61), trouble sleeping, and difficulties with recall and concentration (Tr. 61) as well as her diagnosis of major depressive disorder and personality disorder (Tr. 60, 61).  He nevertheless found Stewart to be not as severely limited as Dr. Van Auken described her, observing normal examination findings by Dr. Van Auken and other providers as well as less severe findings during an assessment by Nurse Cardello, a mental health counselor, and findings by other licensed social workers.  Tr. 60, 61.  Because substantial evidence supports the ALJ's decision, it must be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (A court "defer[s] to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

Lastly, Stewart contends that, because Dr. Van Auken is a doctor at MetroHealth and she "was getting a significant amount of treatment from MetroHealth, Dr. Van Auken had [] access to all of her medical records including other departments" and was therefore in a "unique position to offer opinions as to both the physical and mental aspect" of her limitations.  Doc. 17, p. 17.  Stewart does not cite legal authority that a treating physician's opinion is unique because he had access to other providers' treatment notes and legal authority suggests otherwise.  *See* 20 C.F.R. 404.1527(c) (treating physicians bring a unique perspective to the medical evidence because *they* have treated and seen a patient for a significant length of time).  The ALJ's consideration of Dr. Van Auken's opinions did not violate the treating physician rule or run afoul of the regulations.

### 2. Consultative examiner Dr. Koricke's opinion

Stewart argues that the ALJ erred when he gave only "some" weight to Dr. Koricke's opinion.  Doc. 17, p. 18.  The ALJ described Dr. Koricke's opinion and explained that he gave it "some" weight because it was based on a one-time examination and it was inconsistent with the record as a whole.  Tr. 61.  The ALJ observed that subsequent hospital records continued to show Stewart's unremarkable mental exam findings that were inconsistent with Dr. Koricke's assessed GAF score of 48, which indicated serious symptoms.  Tr. 61 (ALJ citing the following: Dr. Frisof described Stewart as having a normal affect on August 30, 2012; during a hospital stay in November 2012 she was described as calm, cooperative and with normal mood and affect; she denied anxiety or depressive symptoms to Dr. Hergenroeder on September 13, 2013; and, on September 17, 2014, she was described as alert, oriented to all spheres, and having an appropriate mood and affect).  Tr. 61.  The ALJ also commented that mental health Nurse Cardello found Stewart to be vague about her symptoms and described her as mildly depressed

and sleep deprived (for which Cardello prescribed Trazadone) with a GAF score of 51-60, indicating moderate symptoms.  Tr. 60.  The ALJ remarked that Stewart's suicidal ideation was an isolated incident and that she was found, prior to Dr. Koricke's exam, to have normal objective findings by various providers.  Tr. 60.  In other words, substantial evidence supports the ALJ's decision, notwithstanding other evidence in the record that may support a different conclusion.  *Jones*, 336 F.3d at 477.  Finally, the fact that the ALJ gave more weight to state agency reviewing opinions is not error, as Stewart appears to allege; there is no requirement that an ALJ give more weight to an examining physician.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (an ALJ's decision to give greater weight to a state agency reviewer's opinion than an examining or treating source opinion is not reversible error).

In sum, Stewart essentially urges this Court to reweigh the evidence, which the Court cannot do.  *See Garner*, 745 F.2d at 387.  The ALJ did not err when he assigned no weight to the opinion of Dr. Van Auken and only some weight to the opinion of Dr. Koricke.

### B. The ALJ properly considered Stewart's symptoms

Stewart argues that the ALJ did not provide a proper analysis of her symptoms.  Doc. 17, p. 19.  Specifically, she asserts that the ALJ erred in his analysis of her gastropareses symptoms (abdominal pain, nausea and vomiting) and her fatigue and failed to address any of her laboratory findings, such as her hematocrit readings and creatine levels.  Doc. 17, pp. 20-21.

20 C.F.R. § 416.929(c) sets forth the standard for evaluating pain and the extent to which pain can reasonably be accepted as consistent with the objective medical evidence and other evidence.  When evaluating the intensity and persistence of pain, the ALJ considers all available evidence, including objective medical evidence obtained from clinical and laboratory diagnostic techniques (i.e., range of motion, sensory deficit); the claimant's daily activities; the location,

33

duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medications taken; treatment, other than medication, received; and any measures used to relieve pain.  *Id.*

Here, the ALJ considered Stewart's allegations of pain and vomiting associated with her gastroparesis and her fatigue but found her allegations not entirely credible, primarily due to her non-compliance with treatment.  The ALJ detailed the following: that the earliest records from the Ohio Department of Rehabilitation and Correction in 2007, just prior to her alleged onset date, show that Stewart consistently refused insulin against medical advice, despite having been diagnosed with diabetes type I, uncomplicated.  Tr. 56.  By September 2011 she had been diagnosed with diabetes mellitus type II and diabetes neuropathy, was prescribed medication and referred to nutrition services, and her symptoms improved.  Tr. 56-57.  But in February 2012, she was doing worse after she had stopped taking her medications a few months prior, indicating her symptoms were exacerbated by treatment non-compliance and, indeed, caused her to develop additional symptoms that were diagnosed as diabetic gastroparesis.  Tr. 57.  Her gastroparesis symptoms (abdominal pain, vomiting) also improved with medication and, when she was hospitalized, her symptoms always resolved with the same medication and treatment.  Tr. 57.  She was instructed by a provider to "do her part" to take care of herself, to stop smoking cigarettes and marijuana, and to not let herself become constipated for more than three days; Stewart reported that her constipation is what caused her to go to the hospital with gastroparesis symptoms.  Tr. 57.  However, she did not follow up to schedule an EGD as instructed by an attending physician in the emergency room, she tested positive for marijuana at her next emergency room visit, and was restarted on her Lantus and Reglan medications and her symptoms improved.  Tr. 57-58.  Thereafter, her glucose levels were worse but she did not want

to increase her Lantus.  Tr. 58.  She was hospitalized again when constipated with gastroparesis symptoms; her next hospitalization found her awake, alert and comfortable, inconsistent with abdominal pain, and she declined admission for further care.  Tr. 58.  In other words, the ALJ found that Stewart was noncompliant with treatment that proved effective in treating her symptoms and her noncompliance exacerbated her gastroparesis symptoms.  Therefore, he did not find her allegations regarding the limiting effect of `her symptoms to be credible.  *See* 20 C.F.R. § 416.929.

As for fatigue, the ALJ remarked that, although Stewart complained of fatigue and received iron treatments due to her anemia, she was also non-compliant with this treatment.  Tr. 53.  She did not timely follow up with an OB/GYN after it was found that her anemia was secondary to her having heavy menses; when she did follow up she declined recommended hormonal therapy.  Tr. 53.  She was routinely described by providers as alert, oriented, and with normal strength, findings inconsistent with fatigue.  Tr. 53.  She now asserts that her depression also caused her fatigue, and that the ALJ erred because he did not consider how these combined conditions would impact her.  Doc. 17, p. 21.  However, Stewart herself testified that her anemia caused her fatigue, as the ALJ noted.  Tr. 56.  The ALJ considered Stewart's fatigue and her depression; that he did not expressly state that he considered her fatigue in the context of her depression is not error.

Finally, Stewart argues that the ALJ erred because he did not refer to her laboratory findings, specifically her hematocrit and creatinine levels.  However, given that the ALJ explained that Stewart's non-compliance with treatment caused and exacerbated many of her symptoms, the failure to cite her hematocrit and creatinine levels is not error.  For instance, Stewart points out low hematocrit readings in her blood work, indicating anemia, but the ALJ

explained that her anemia was deemed to be a result of heavy menses and she did not follow treatment advice to cure this problem.  Moreover, she admitted to Nurse Cardello that she had not been taking her prescribed iron pills.  Tr. 905.  As for her creatinine levels consistent with chronic kidney disease stage II-III, Stewart does not identify evidence in the record wherein a provider described any symptoms or limitations that she had based on her creatinine levels.

In short, the ALJ properly considered Stewart's symptoms and his decision must be affirmed.  *Wright*, 321 F.3d at 614 (A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record); *Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

### C.  Stewart is not entitled to a Sentence Six remand

Stewart argues that the evidence she submitted to the Appeals Council is new and material in that it demonstrates the extent of her gastroparesis and anemia.  Doc. 17, p. 21. Therefore, she submits, her case should be remanded for the consideration of these records.  Doc. 17, pp. 21-22.

When an ALJ renders the final decision of the Commissioner, additional evidence submitted to the Appeals Council before or after the Appeals Council denies review should be considered only for the purpose of a Sentence Six remand.  *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).  A court may order a Sentence Six remand upon a showing by the moving party that (1) the additional evidence is both "new" and "material" and (2) there is "good cause" for failing to provide the evidence previously.  42 U.S.C. § 405(g); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec*., 447 F.3d 477, 483 (6th Cir. 2006) (quoting *Faucher v. Sec'y of Health & Human*

*Servs.*, 17 F.3d 171, 174 (6th Cir.1994)).  Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).  Evidence is "material" if there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.* (citing *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)).  "Good cause" is a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.  *Id.* (citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984)).

The evidence submitted by Stewart is not material.  Both records are hospital visits: the first for a bout of gastroparesis after she had not taken her medication; she was treated with her medication; and then discharged herself against medical advice.  Tr. 1627, 1629-1630.  The second visit was for gastroparesis complaints and fatigue; she reported that she had not had a bowel movement in seven days and her abdominal pain resolved after she had one after she was admitted.  Tr. 1695, 1698.  The ALJ had noted in his decision that at least one provider had warned Stewart to not let herself become constipated for more than three days.  Tr. 57.  Stewart also admitted during this hospital visit that she had stopped taking her iron pills a few weeks prior.  Tr. 1699.  Lastly, Stewart was still smoking a half to one pack of cigarettes a day and using marijuana daily (Tr. 1710-1711); she refused an endoscopic procedure and requested she be discharged (Tr. 1695); and the attending physician warned her of the risks of an incomplete work-up, including the likelihood that she would again find herself hospitalized, and strenuously urged her to continue checking her blood sugar levels (Tr. 1695).  This evidence only serves to bolster the ALJ's finding that Stewart is persistently non-compliant with treatment and her non-

compliance exacerbates her symptoms.  Therefore, it cannot be said that this new evidence

creates a reasonable probability that the ALJ would reach a different conclusion if he were

presented with it.  *Foster*, 279 F.3d at 357.  Stewart is not entitled to a Sentence Six remand.

## VII. Conclusion

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.


Dated: February 7, 2017

Kathleen B. Burke
United States Magistrate Judge